**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                            No. **CR 02-276 LH (MCA)**

**ISABEL RODRIGUEZ-HERRERA**,

    Defendant.

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS**

**THIS MATTER** came before the Court on Defendant Isabel Rodriguez-Herrera's Motion to Suppress Physical Evidence and Statements filed on March 27, 2002. On May 1, 2002, the Court held an evidentiary hearing on Defendant's motion in Las Cruces, New Mexico. Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court **DENIES** Defendant Isabel Rodriguez-Herrera's Motion to Suppress Physical Evidence and Statements based upon the following findings of fact and conclusions of law.

**I.**      **FINDINGS OF FACT**

    1.      United States Border Patrol Agents Mark Bazill and John Hawley were on duty and in uniform at a fixed Border Patrol immigration checkpoint on Highway 54 near

Orogrande, New Mexico, during the time period between approximately 9:25 p.m. and 9:30 p.m. on or about February 10, 2001, when the events described below occurred.

2. At approximately 9:25 p.m., Agent Bazill observed Defendant and her ten year-old daughter drive northbound into the checkpoint's primary inspection area in a red Ford Ranger pickup truck with a pinata in its bed.

3. Agent Bazill greeted Defendant and asked her about her citizenship and that of her daughter. Defendant responded by producing her resident-alien card and stating that her daughter was a United States citizen. Agent Bazill then returned Defendant's resident alien card to her.

4. Agent Bazill next asked Defendant about her travel plans. Defendant explained that she was going to Amarillo, Texas, and coming from Juarez, Mexico by way of El Paso, Texas, where she had picked up her daughter. Highway 54 provides a relatively direct route of travel between El Paso and Amarillo.

5. As Agent Bazill was questioning Defendant, he began to walk around her truck. While walking around Defendant's truck, Agent Bazill noticed that the truck had brand new Texas license plates and that there was a single key in the ignition that was not attached to any other keys or a key chain. It was Agent Bazill's experience that most vehicle owners keep their vehicle keys together on the same key chain with their other keys and that a lone ignition key and new license plates are signs of a recent change in ownership. It was also Agent Bazill's experience that vehicles containing contraband often have undergone a

recent change in ownership because narcotics smugglers buy cars and alter them to hide their illegal cargo.

6. Upon making these observations, Agent Bazill returned to the driver's side of the truck and asked Defendant if she was the owner of the truck. Defendant replied that she had just bought the truck a month ago.

7. Agent Bazill then asked Defendant if she had the vehicle registration form for the truck. Defendant responded that she had lost the vehicle registration form, but stated that she had a sales contract for the purchase of the truck. Defendant appeared nervous as she attempted to locate the papers. They were not located. Agent Bazill continued to walk around and observe Defendant's truck while he was questioning Defendant.

8. Agent Bazill reached underneath the truck and used his baton to tap on the truck's gas tank, which was located about twelve to eighteen inches from the side of the truck.

9. Agent Bazill perceived that the tapping on the truck's gas tank produced a solid sound rather than a hollow sound. Based on his training and experience, Agent Bazill associated this solid sound with gas tanks that contain solid objects because they are being used to conceal contraband.

10. After ascertaining that Defendant could not produce her vehicle registration form, observing that Defendant's truck had brand new license plates and a lone ignition key, and hearing the solid sound produced by his tapping on the truck's gas tank, Agent Bazill asked Defendant for her consent to search the truck. Agent Bazill did not inform Defendant

that she was free to leave instead of consenting to the search, nor did he obtain her consent to the search in writing at that time. Nevertheless, Defendant orally acquiesced to the search and drove the truck to a secondary inspection area about twenty feet away in accordance with Agent Bazill's request.

11. Upon hearing Defendant's verbal agreement to go to the secondary inspection area, Agent Bazill requested that Agent Hawley and his dog, Donna, perform a canine inspection of Defendant's truck. Agent Hawley testified concerning the dog's experience and training as a canine inspector. The dog's reliability as a detector of the odor of marijuana has not been contested by Defendant in this matter.

12. Agent Hawley and the dog performed the canine inspection of Defendant's truck as requested by Agent Bazill and, during the inspection, the dog alerted underneath the truck next to its gas tank.

13. After the dog alerted, Agents Hawley and Bazill looked underneath the truck at the gas tank area and observed that the bolts attaching the truck's bed to its frame rails were shiny. It was the agents' experience that such shiny bolts indicate that the bed of a truck recently has been removed. It was also their experience that gas tanks on pickup trucks are sometimes used to conceal contraband.

14. After the dog alerted and the shiny bolts were observed, the agents placed a fiberoptic scope into the gas tank and saw bundles wrapped in cellophane or plastic occupying about seventy-five to eighty percent of the space in the gas tank. It was the agents' experience that such bundles in a vehicle's gas tank typically contain contraband.

15. After the above events occurred, Defendant was arrested and the gas tank of her truck was subsequently opened to retrieve the bundles. Approximately seventy-one pounds of marijuana was found in the bundles that had been concealed in the gas tank of Defendant's truck. The sales contract that Defendant had mentioned while being questioned by Agent Bazill also was found in the vehicle while it was being inventoried after Defendant's arrest.

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The central question of constitutional importance in this case is whether Agents Bazill and Hawley were lawfully in a position to perform a canine inspection of Defendant's truck at the Border Patrol checkpoint's secondary inspection area upon observing the new license plates and lone ignition key, determining that Defendant did not have her vehicle registration form or proof of ownership, and hearing a solid sound emanating from the truck's gas tank when it was tapped with a baton. The Court concludes that the answer to this question is yes because the suspicious circumstances the agents had observed up to that point amounted to a reasonable suspicion that Defendant was engaging in criminal activity, namely, the smuggling of narcotics.

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in her person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v.

Acevedo, 500 U.S. 565 (1991). Defendant has standing to challenge the seizure of her person and her vehicle, see United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996), and it is the Government's burden to show that its warrantless searches and seizures are reasonable, see United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). If the Government cannot meet its burden, then the evidence obtained as a result of the seizure must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure. Wong Sun v. United States, 371 U.S. 471, 488 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

"It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000). Nevertheless, "brief, suspicionless seizures at highway checkpoints for the purposes of combating drunk driving and intercepting illegal immigrants [a]re constitutional." Id. at 34. The Supreme Court also has suggested that "a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible." Id. at 38.

The primary programmatic purpose of the checkpoint on Highway 54 where Defendant's truck was initially seized is to intercept illegal immigrants. Accordingly, the Border Patrol's Highway 54 checkpoint remains constitutionally permissible under Edmond, 531 U.S. at 47.

At this type of checkpoint, it is lawful for a Border Patrol agent to "ask questions reasonably related to his duties and explore suspicious circumstances" so long as such

questioning and exploration is "brief and unintrusive." United States v. Massie, 65 F.3d 843, 848 (10th Cir. 1995). Issues that are reasonably related to a Border Patrol agent's duties ordinarily include citizenship and immigration status, vehicle ownership, cargo, destination, and travel plans. See id. at 847-48. In addition to questioning the vehicle's occupants, a Border Patrol agent at a fixed checkpoint ordinarily may explore suspicious circumstances by requesting "documentation" from the occupants and making "a cursory visual inspection of a vehicle." Id. at 848.

Agent Bazill's questioning of Defendant, his request that she produce her vehicle registration form, and his visual inspection of the truck's new license plates and lone ignition key fall within the scope of permissible activities outlined in Massie. Id. at 847-48. Further, Agent Bazill's entire investigation of Defendant and her truck at the checkpoint's primary inspection area lasted no more than a few minutes and did not exceed the permissible duration of a routine checkpoint stop. See id. at 849.

Agent Bazill's tapping on the truck's gas tank with his baton, however, does not fit as easily within the categories of activities discussed in Massie and requires further analysis. On the one hand, if Border Patrol agents are permitted to make "a cursory visual inspection of a vehicle" at a fixed checkpoint, see id. at 848, by analogy it would seem to follow that they also are permitted to use their other senses to detect suspicious circumstances from a lawful vantage point. See generally Minnesota v. Dickerson, 508 U.S. 366, 375-77 (1993) (suggesting that the "plain-view doctrine" also encompasses a plain-touch doctrine). On the other hand, both the Supreme Court and the Tenth Circuit have concluded that there are

limits to this analogy because there are circumstances in which a law enforcement officer's touch can be more intrusive than his sight. See Bond v. United States, 529 U.S. 334, 339 (2000) (concluding that feeling a soft-sided bag in the overhead luggage rack of a bus "in an exploratory manner" violated the Fourth Amendment); United States v. Nicholson, 144 F.3d 632, 640 (10th Cir. 1998) (similar). In addition, an officer's use of a tool or device to enhance his perception may in some instances constitute a search within the meaning of the Fourth Amendment, even though the officer remains at a lawful vantage point and there is no physical intrusion. See, e.g., Kyllo v. United States, 533 U.S. 27, 40 (2001) ("Where . . . the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant."); United States v. Cusumano, 67 F.3d 1497 (10th Cir. 1995) (similar), vacated on reh'g en banc, 83 F.3d 1247 (10th Cir. 1996).

In this case, the Court finds Agent Bazill's tapping on the gas tank of Defendant's truck to be distinguishable from the exploratory groping of luggage at issue in Bond and Nicholson. Unlike the luggage at issue in those cases, Defendant's gas tank presented a hard surface on the exterior (albeit the underside) of her truck, and the purpose of Agent Bazill's tapping was to hear the sound it produced rather than to feel what was inside. Given the lesser expectation of privacy that individuals have in their vehicles, see generally California v. Carney, 471 U.S. 386, 390-93 (1985), as well as the Tenth Circuit's conclusion that "[t]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable

expectation of privacy," United States v. Rascon-Ortiz, 994 F.2d 749, 754 (10th Cir. 1993), the Court is of the opinion that the type of tapping on the gas tank that Agent Bazill performed in this instance was not a search requiring additional justification under the Fourth Amendment, see United States v. Munoz-Melchor, 894 F.2d 1430, 1435-36 (5th Cir. 1990) (concluding that tapping on side of propane tank mounted on exterior of pickup truck fell under plain touch doctrine).

The Court also finds that Agent Bazill's use of his baton to perform the tapping is distinguishable from the uses of more sophisticated technology at issue in Kyllo and the panel's opinion in Cusumano. Unlike that technology, Agent Bazill's baton is a device that has been in general use for quite some time, and a baton's capacity to extend an agent's reach is more akin to the perception-enhancing qualities of a common flashlight or mirror. Inasmuch as law enforcement officers are permitted to use flashlights and mirrors to aid their observation of items in plain view on the undercarriage of a motor vehicle, see Rascon-Ortiz, 994 F.2d at 755, the Court concludes that Agent Bazill's use of his baton to extend his reach to the area of the gas tank located on the exterior undercarriage approximately twelve to eighteen inches from the side of Defendant's truck did not constitute a search requiring additional justification under the Fourth Amendment.

Having concluded that Agent Bazill's investigative activities at the checkpoint's primary inspection area did not exceed the permissible scope or duration of a routine Border Patrol checkpoint stop, the Court next examines whether the information Agent Bazill gleaned from these activities amounted to the kind of suspicious circumstances or

reasonable suspicion that is sufficient to warrant further detention at the checkpoint's secondary inspection area.[1] Determining the reasonableness of the suspicions that prompted Agent Bazill to ask for a canine inspection does not depend on any one factor or series of factors. See United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Rather, the Court must consider the totality of the circumstances. See id. "In examining the totality of the circumstances, '[c]ommon sense and ordinary experience are to be employed and deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" United States v. De La Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)). Reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'" Lopez-Martinez, 25 F.3d at 1484 (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)).

An agent cannot, however, predicate an investigative detention of a vehicle and its occupants solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946. Although it is "possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete

---

[1] The Government contends that no justification is needed for any further detention because, among other things, Defendant consented to go to the secondary inspection area. The Court finds it unnecessary to decide the issue of the voluntariness of Defendant's consent because Agent Bazill's suspicions were reasonable enough to justify further detention for purposes of conducting a canine inspection at the secondary area regardless of whether he had Defendant's consent.

reasons for such an interpretation.'" Id. at 948 (quoting Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)).

In this case, the new license plates on Defendant's truck and the lone key in the ignition, while suggesting a recent change of ownership, are not in themselves indicative of criminal activity. When viewed in the context of Defendant's inability to produce the vehicle registration form and the solid sound emanating from the tapping on the truck's gas tank, however, these factors combine to form suspicious circumstances or reasonable suspicion that justifies further detention for purposes of performing a canine inspection at the secondary area. See Massie, 65 F.3d at 849.

While Defendant claims she offered to produce a sales contract in lieu of the vehicle registration form, she appeared nervous when she was unable to locate any documentation. In addition, Defendant offered no innocent explanation for why the truck's gas tank made a solid sound when Agent Bazill tapped on it with his baton, and the Court gives credence to the agent's testimony that such a sound is frequently associated with contraband hidden in the tank.

For these reasons, Defendant and her truck were lawfully detained at the secondary inspection area when Agent Hawley and his dog performed the canine inspection. As soon as the dog alerted next to the truck's gas tank and the agents observed the shiny bolts on the truck's undercarriage, there was probable cause to arrest Defendant and search her truck. See id. Because the entire detention and search met the Fourth Amendment's requirement

of reasonableness, the exclusionary rule provides no basis for suppressing the evidence or statements that resulted from these activities. See id.

## III. CONCLUSION

For the foregoing reasons, the Border Patrol agents' suspicions were reasonable and sufficient to justify the detention of Defendant and her pickup truck at the checkpoint on Highway 54, and the ensuing canine inspection of the truck produced further information that established probable cause to arrest Defendant and search her truck.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress Physical Evidence and Statements be and hereby is **DENIED**.

Dated in Albuquerque this 10th day of May, 2002.

_____
**M. CHRISTINA ARMIJO**
United States District Judge


Counsel for the Government:
**Damon P. Martinez**
Assistant U.S. Attorney
Las Cruces, New Mexico

Counsel for Defendant Isabel Rodriguez-Herrera:
**Mario A. Esparza**
Las Cruces, New Mexico